NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.—OCTOBER, 1876.

## GILLESPIE *v.* BROOKS.

*In the matter of the Estate of* ALFRED K. MOUNT, *deceased.*

Executors and testamentary trustees with general power to invest and reinvest a fund, are bound to invest it within a reasonable time, in securities of the class sanctioned by the court.

If the assets left by the testator consist of stocks of private corporations, they should sell them and duly invest the fund within the eighteen months allowed for settling the estate.

If they neglect to do so, they are personally liable for loss by the depreciating of such irregular securities left by the testator, after the expiration of the eighteen months.

Where some of such securities maintain full value or increase in value, and others depreciate, the *cestuis que trustent* may elect to accept the investment as to the former, and claim the chanced value and income therefrom, and still reject the latter, and hold the trustees chargeable with the loss thereon.

The trustees are liable in such case, although they acted in good faith.

The fact that the trust is not terminated, does not preclude the exercise of the election by the *cestuis que trustent.*

The right to have an account of the trust taken and settled, includes a right on the part of all the beneficiaries who are *sui juris*, to elect as to the irregular investments.

Executors or administrators who, without a Surrogate's order, compound debts due the estate which were inventoried as worthless, are not chargeable with more than they have collected, unless there is evidence of bad faith or serious error of judgment.

They have power to compound claims, independent of the statute which gives additional protection when they act under leave of the Surrogate.

Debts due the decedent to a large amount were inventoried as worthless, and the executors, under the advice of the decedent's bookkeeper who was familiar with the circumstances, did not attempt to collect them by suit. *Held*, that they were not chargeable with such debts, in the absence of evidence that the debts might have been collected.

Executors are not bound to require vouchers from creditors whose claims are attested by the decedent's books of account and by personal information of their correctness from his bookkeeper.

So information from the widow that a certain sum is due from the decedent to a servant, is sufficient to justify the executor in making payment without a voucher.

All ordinary taxes, assessments and interest on incumbrances, and charges for ordinary repairs, must be paid out of the income by the life tenant.*

In the case of permanent improvements to the estate, the life tenant must be held liable for the interest and the remainderman for the principal.

An executor may be allowed a demand in his own favor against the decedent, if it be not barred by the statute, though it be presented for the first time during a contest raised by the legatee against his account, and though he testifies that he interposes it only in consequence of such contest.

Mucilage being a substance sufficiently tenacious to adhere, and capable of receiving and retaining an impression, a bit of paper affixed with mucilage and stamped on with a permanent impression, is good as a common law seal.†

The mere fact that the executor's retention of irregular securities has caused loss to the estate, is not ground for refusing them commissions.

---

* Compare, *Bohde* v. *Bruner, ante*, 333; *Burleigh* v. *Center*, 1 *Sup. Ct.*, (*J. & S.*) 441; *Grannis* v. *Cook*, 3 *Sup'm. Ct.* (*T & C.*) 299.

† As to necessity of impression, see *Van Bokkelen* v. *Taylor*, 62 *N. Y.*, 105; rev'g 2 *Hun*, 138; *S. C.*, 4 *Sup'm. Ct.* (*T. & C.*) 422.

Costs of an executor's accounting may be allowed to them out of the estate, although the contest has resulted in charging them with losses, &c., not credited by them in their account.

THIS was an accounting by the surviving executors, and trustees of the estate of Alfred R. Mount, deceased.

Objections to the account were filed by the three daughters, Mrs. Gillespie, Mrs. Carrol, and Mrs. Allen, and the matter was referred to the late Mr. Van Schaick as auditor and referee, and a large amount of testimony was taken, upon the questions involved in the accounting before the referee, but no report was ever made; and the case was argued before the present Surrogate, and submitted to him, on the account, objections, and testimony.

The testator died July 17th, 1864, leaving a last will and testament which was admitted to probate, August 6th, 1864, and letters testamentary were issued to Elisha, and Daniel H. Brooks, and to Mrs. Hannah B. Mount, the widow, who were by the will, appointed executors and executrix.

Daniel H. Brooks, and Elisha Brooks, two of the executors, were made trustees.

The testator left him surviving, his widow, who died, July 3, 1870, and four children, Gilbert H. Mount who died without issue February 18th, 1875, Mary Elizabeth Carrol, Hannah G. Mount, now Gillespie, Helen B. Mount, now Allen.

By his will the testator bequeathed $5,000, in trust, for Gilbert H. Mount, for life, remainder to his sisters, and the issue of such as were dead, which on his death was distributed by the trustees, according to the will; $5,000 in like trust for Mrs. Carrol for life, remainder over to her issue, if any; if none, then for her surviving sisters, and the issue of such as might be dead; $5,000 in like trust for Hannah G. Mount, row Gillespie, for

life, remainder over, as in the case of Mary Elizabeth; $5,000 in like trust for Helena Brooks Mount, now Allen, for life, remainder over, as in the case of the last.

He also gave the use of certain premises to his sisters, Mary Mount and Elizabeth Rundlett, for life, remainder over to testator's children—also $3,000 in trust for his said sisters, for life, remainder over to said children.

The residue of his estate he gave in trust, to apply the income to his widow, during her life, to be safely invested, with power to change the investments as the trustees might deem proper, and upon the death of the widow, the trustees or the survivor of them were directed to take of the residuary fund of $20,000, and invest the same, and to devote the interest and income thereof, in their discretion, in monthly payments, to the use of the said Gilbert H. Mount, during his life, but in case the residue of the said residuary estate, after deducting $20,000, should exceed $100,000, then a fourth part of the excess was directed to be added to the $20,000, subject to the same trust, and on his death, the sum so held in trust for him, and the income thereof, were directed to be distributed in equal shares among his surviving sisters, and the issue of any deceased sister, *per stirpes*, and also upon the decease of the widow, the balance of the residuary estate was directed to be divided into there equal parts, and each part to be held in trust by his said trustees, and the income thereof to be applied to each of the three daughters during their lives respectively, and on the death of either, to be divided among her issue, if any.

The objections filed, so far as material to the decision, were as follows:

*First.*—To the sale and the amount realized there-

by, of bank stock, railroad, insurance stocks, and promissory notes.

*Second.*—To certain discounts amounting to $1,111.25 on certain notes, assets of the estate.

*Eighth.*—That the trustees state in their account that the inventoried value of 328 shares of the Tradesmen's National Bank was $10,886, whereas in fact it was $13,448, and that 280 shares of the American Exchange Bank was inventoried at $23,745.26, whereas in fact it was $23,920.

*Eleventh.*—That the assets consisting of stocks, were not sold and converted, and the proceeds invested in securities permitted by law, within a reasonable time after the death of the testator.

*Twelfth.*—To the trustees crediting themselves the inventory price of the bank, insurance, mining and manufacturing stocks, because they have depreciated since the inventory, and the trustees are liable for the loss because they unlawfully retained them.

*Thirteenth.*—That they held securities contrary to law, and the provisions of the will, and are thereby chargeable for the loss.

*Fourteenth.*—To the items of debts, not collected.

*Seventeenth.*—To al' the charges made for payment of taxes, insurance and repairs of the Elizabeth property, also to payments made to Bessie Murphy, of $1,065.26; Ann Murphy, $315 for services rendered, also to payment to William Endall, of $925.16, because no vouchers were furnished. On the argument it was also claimed that the promissory note of the deceased, under seal, should not be allowed, because not proved and outlawed; that no commissions should be allowed, and that the trustees should be compelled to pay the expenses of this accounting, because of their neglect of duty, and among others, that they failed to collect

debts, that they paid debts without inquiry as to their validity, took no receipt, mixed the trust funds with their private funds, used the trust funds in their business, failed to sell insurance stocks, kept no private account, trumped up the note mentioned, falsified their accounts, and failed to file their account for ten years, &c.

The following facts appeared by the inventory, and the testimony taken. There were various bank, insurance, and other stocks at the time of making the inventory, July 20th, 1865, estimated at the sum of $71,882.20, and these stocks were held by the executors until after considerable progress had been made in the accounting. In consequence of the objections to the retention of these stocks by the executors, they were on the 3rd of February, 1875, sold at public auction, and they then realized the sum of $67,406.13. The estimated value of these stocks, in February, 1866, eighteen months after the issue of letters testamentary, amounted to $70,194.80. A considerable decrease in the value of several insurance stocks resulted from the great fire in Chicago, and some of the stocks were thus rendered entirely worthless. The executors paid the respective legatees the income of the estate according to the provisions of the will, and the aggregate amount of the income from the stocks from February 1st, 1866, to February 1st, 1875, was $49,478.17, equal to very nearly eight per cent. upon the valuation eighteen months after the issuing of letters, amounting to an excess of $11,572.98, over and above the income thereon, computed at 6 per cent. If the amount of the valuation of the stocks, eighteen months after the issuing of the letters, had been invested in United States securities at 5 per cent, the income would have been $40,983.99, or $8,494.81 less than was actually realized, and if invest-

ed in such securities at 6 per cent. the income would have been $45,122.07, or $4.356.10 less than was actually received.

Several notes belonging to the estate which were inventoried as worthless, were collected at a discount by one Mr. Endall, who was paid 10 per cent. for collecting, under an arangement for this purpose, which amounted to $1,112.49.

The testimony also showed that in the account rendered by the executors, a mistake occurred in crediting the estate with 328 shares in the Tradesman's National Bank, at $10,886, whereas it should have been $13,448, showing a difference of nearly $3,000 ; and a like error in crediting 208 shares of the American Exchange National Bank, at $23,745.26, whereas it should have been $23,920, making a difference of $174.74, also a mistake in crediting the executors for 20 shares of the Home Fire Insurance Company's stock, at $8,000, whereas it should have been credited at $2,000, showing a mistake of $6,000.

The counsel for the legatees claimed that the executors were liable for a failure to collect various notes amounting to over $50,000, which were inventoried as worthless because they made no effort to enforce them by suit.

Upon this subject the evidence showed that a former clerk of the testator, who was familiar with the assets, and the various securities, had charge of the collection of the notes, and made efforts to collect them, but not by suit ; that the executors examined the accounts, and made inquiries of him in respect to the collectability of the same, but there is no evidence in the case showing that any securities not collected were collectable.

It is also objected by the same counsel, that a very large amount of indebtedness, to wit, $191,944.16, was

paid to creditors of the deceased without any knowledge of the correctness of the claims.

Upon this subject the testimony showed that the indebtedness appeared upon the books of the testator, and that the testator's clerk understood the claims, and their genuineness, and advised the executors in respect to them.

The testimony also showed that the executors paid Bessie Murphy, $1,065.26, for services rendered for testator, and for which he was indebted in that sum, at the time of his decease; also to Ann Murphy, $315, for like services, without any vouchers, but on information furnished to them by Mrs. Mount, the widow.

It also appeared that the executors paid William Endall $925.16, the allowance of which was objected to by counsel for legatees, on the ground that it was for services, and was paid without any voucher; but the testimony showed that Mr. Endall had an arrangement with the testator, by which he was to receive 10 per cent. upon the profits of deceased's business, over and above $20,000 per year—that his statement of that agreement was corroborated by that of Mrs. Mount, and that the sum above stated was paid under that agreement.

Another item objected to, was as to the sum of $744.20 paid to Mrs. Mount, which the executors testified was an over payment, and which would seem to be properly chargeable as against her estate, and not as against this estate.

The testimony shows that the executors paid on account of taxes, insurance, assessments, repairs and improvements on the Elizabeth property, the sum of $5,138.29, it being upon premises by the will devised to the testator's sisters, Mary Mount and Elizabeth Rundlett, during their joint lives, and the survivor of them, to use and occupy.

These expenses appeared to have been incurred under the authority of the widow, to the amount of $2,100, and apparently with her knowledge as to the balance. It appeared also that prior to the decease of the testator, his sisters had occupied the same premises for a considerable period, testator attending to the repairs, paying taxes, &c., and that the sisters had no other means of support, except the use of the premises, and the legacy given to them in the will ; that the widow said to the executors that she was willing the repairs should be made, as she considered, virtually by her, and this she said at the time when she was examining the executors' account, where she had been charged for carpenter work, plastering, masonry and laborers. The account thus referred to was an account, where these charges were made against the income of the estate for that current year. The expenses were a thousand dollars larger than she expected to pay, and she made an agreement with her nephew, Mr. Rundlett, that he should consider that he owed her a thousand dollars, and he should pay her interest at 7 per cent., and that he did pay on account of such interest $100 ; that the obligation for payment of the $1,000 was not in writing, but the hundred dollars was credited to her personal account.

The executors gave in evidence a promissory note bearing date December 29th, 1862, under seal, for $4,982.57, payable one day after date, at 6 per cent., to the executor, Elisha Brooks, or order.

It appeared in evidence that this note was given for a prior note, of the same amount, which prior note bore no interest ; it was given for money loaned from time to time to the testator, when he was in pecuniary embarrassment ; that the executors had rendered a former account, and also the account in this proceeding,

but had not included this note in either of the accounts, and that the claim was made during the progress of this accounting, because of the litigation of their accounts ; that when the note in question was given, the testator said, " that he hoped to be able to pay this note;" that it had never been presented to him, or demanded, nor had it been presented to the estate as a claim against it, and that no interest had been demanded, or paid. The payee, Elisha Brooks, testified that he did not intend to inforce it, until this contest arose, because his sister Mrs. Mount had requested him not to do so.

Some testimony was given upon the subject of the character of the seal, tending to show that it was an ordinary paper sold by stationers, for seals, with mucilage on one side, to adhere by wetting, and was stamped on by a letter stamp, without any water or wax being used.

The above is substantially the testimony presented upon the questions raised by the objections to the account, and urged on the argument of the case, except that some testimony was given tending to show neglect in filing an inventory, in keeping a separate account of the affairs of the estate, and a commingling of its funds, with the funds of the executors, Messrs. Brooks.

J. W. C. LEVERIDGE, *and* S. P. NASH, *for the executor.*

L. L. DELAFIELD, *and* JAMES MATTHEWS, *in opposition.*

THE SURROGATE.—As to the question of the alleged violation of the duty of the trustees in retaining the securities, such as bank and insurance stocks, it is well settled by numerous authorities that the trustees under such circumstances, must invest the fund in government, or real estate securities (*King* v. *Talbot,* 40 *N. Y.,* 76). Justice WOODRUFF, in that case says, " my own judgment after an examination of the subject, bearing

in mind the nature of the office, its importance, and the consideration which alone induces a man of suitable experience, capacity, and responsibility, to accept its usually thankless burden, is that the just and true rule is, that a trustee is bound to employ such diligence and such prudence, in the care and management, as in general, prudent men of discretion and intelligence, in such matters, would employ in their own like affairs." But he further suggests that such prudence excludes all speculation, all uncertain and doubtful risks ; that the preservation of the fund, and the procurement of the best income therefrom, are the primary objects of the trust, and should be primarily urged.

It is quite evident that the purpose of the testator was to provide investments which would yield a regular income for the support of his children, and the maintenance of his widow ; that the trustees were chargeable with the duty of making such investments within a reasonable time after they had assumed the trust ; nevertheless, it seems to be conceded by the counsel for the legatees that a reasonable time for the disposition of the irregular securities found on hand, would be 18 months, as the time afforded by the statute, for the full performance of their duties as executors.

In *Lockhart* v. *The Public Administrator* (4 *Bradf.*, 21), it is held substantially that an administrator is not bound to make a temporary investment for the benefit of the estate, but that he may be required by the Surrogate to deposit the funds with a Trust Company, so as to be earning interest, while the estate is in process of settlement, and which I think substantially gives the executors that 18 months, in which to convert the securities on hand, and to make the necessary investment as trustees.

In the case of *King* v. *Talbot (supra)*, there were ir-

regular investments made by the trustees themselves, which were adjudged improper, and the trustees were charged with the amount of money so involved, with 6 per cent. interest.

The counsel for the legatees claims that the bank stock, which proved to be quite profitable, should have been retained by the trustees, and that it was competent for the *cestuis que trustent* to elect to accept such securities as they chose, and reject the others, they having withdrawn all objection to the executors' account, so far as it related to the retention of the bank stock, which withdrawal bears date February 7th, 1876.

I entertain no doubt that it was the duty of the trustees to sell the securities mentioned, including the bank stock, without any objection having been made by the beneficiaries. I do not think that the objection filed to the account upon that subject, affected the rights of the *cestuis que trustent.* In other words, it seems to me that the sale of the bank stock was authorized by the trustees, and that the *cestui que trustent* were entitled to the benefit of whatever income had been derived from the bank stock up to the time of its sale, and that they had the right to discriminate in their acceptance or rejection of the income from the several accounts of stock retained, and though the language of Mr. Justice Woodruff, in *King* v. *Talbot,* above cited, page 91, was *obiter,* nevertheless it was based upon authority, and obvious principles of equity.

It would be very inequitable to allow trustees to make various investments in violation of the well-settled rule of law. Because one investment should prove successful, and largely renumerative, they might use that for the purpose of relieving themselves from loss, by reason of other unauthorized investments which should prove a loss; in short, each investment should stand upon

its own merits. (See *Hill on Trustees*, 374.) It becomes necessary in settling the trustees' account, in respect to a mass of securities inventoried, consisting of bank stock, insurance stock, &c., to ascertain the actual income of each particular stock; if the bank stock paid a larger dividend than 7 per cent., the *cestuis que trustent* are entitled to be credited the full amount received: and as to the insurance and other stocks, where there was a loss, the income received from them should be charged against the 6 per cent interest upon the estimated value 18 months after the issuing of letters testamentary. And one of the statements or testimony seems to afford the necessary evidence to enable me to make a statement of such receipts, or income. Hence, it seems to me that it will be necessary to make a reference to take testimony upon that subject, but it may be well to suggest that the respective legatees, except the widow, can only be charged with the excess of interest paid to them, and that any excess paid to the widow cannot be allowed to the trustees, on this accounting, as against the other legatees, for any over payment made to the widow, which must be charged to her, and the trustees must look to her estate for the purpose of reimbursing themselves (*Raly* v. *Ridelagh*, 7 *De Gex, M. & G.* 104; *Trafford* v. *Boehm*, 3 *Atk.*, 440.)

This seems to me to be the necessary result of the authorities cited, without regard to the question of good or bad faith on the part of the trustees, but it is due to the case to say that I find no evidence which impugns that good faith.

It is urged by the counsel for the trustees that the attempted election on the part of the legatees to receive the income of the bank stock, is not allowable under the authority of *King* v. *Talbot*, because the trust is still in force, and there is no party competent to make an election to retain the profitable investment.

I see no good reason why the continuance of the trust should debar them from such an election. If they have the right to this accounting, it necessarily involves the right to have the trust accounts finally and authoritatively settled to the date of the present accounting; and I am not able to appreciate or perceive any difficulty on the part of the adult *cestui que trustent* in making such election.

The argument would undoubtedly be good, were the *cestui que trustent* infants, or otherwise incapacitated from approving of the investments, or estopping themselves from objecting thereto.

As to the objection that certain discounts on notes were allowed without the authority of the Surrogate to compromise them, it is sufficient to answer that the executors had full power to do so, without any liability over to the estate, unless it were shown that they made a serious error in judgment: the statute authorizing the compromises of debts due to the estate by the executor and administrator does not confer upon those officers powers which they did not possess before, but affords additional protection when acting in good faith in the exercise of their common law powers. (*Redfield Surr. Pr.*, 232; *Choteau* v. *Suydam*, 21 *N. Y.*, 179; *Matter of Scott*, 1 *Redf.*, 234); and there is no evidence in this case, that the compromises made were not judicious, or that a larger sum might have been realized by the executors.

The error in the statement of the value of the 328 shares of the Tradesman's National Bank, being an understatement of $25.62, and of 280 shares of the American Exchange Bank stock being an under-estimate of $174,—as also the $64.00 over statement of Home Fire Insurance stock, should be corrected according to the fact.

The objection that the executors failed to collect the debts, or to bring suits for the same, seems to me untenable, for the reason that the debts in question were such as were inventoried as worthless, and there is no evidence tending to show that any such debts were collectable, and under the circumstances appearing in the testimony, it seems to me that it would have been an unauthorized expense to the estate, to have prosecuted such claims, as were inventoried under the advice of the bookkeeper of the testator, as worthless.

The objection to the large payment by the executors, of the debts of the firm, is equally untenable, because they derived their information as to the validity of such claims against the estate from the books of the testator, and it seems to me that it would be an extraordinary precaution to require additional vouchers for such claims.

As to the payment to the then late servants of the deceased, it was sufficient authority for them to pay those claims when made, and the widow, who must have been conversant with the facts, informed the trustees that the claims were just and valid, and it should therefore be allowed as charged.

I have now reached a question involved in this case, of considerable embarrassment, which is, the objection interposed to the charges made by the executors and trustees for the payment of taxes, insurance, and repairs upon the Elizabeth property.

It is well settled that all ordinary taxes, assessments and interest on encumbrances and charges for repairs, must be paid out of the income by the life tenant (*Hepburn* v. *Hepburn*, 2 *Bradf.*, 74; *Griswold* v. *Griswold*, 4 *Id.*, 216; *Sheldon* v. *Ferris*, 45 *Barb.*, 124; *Pinckney* v. *Pinckney*, 1 *Bradf.*, 269; *Booth* v. *Ammerman*, 4 *Id.*, 129); but it is also held that a municipal assessment

for the flagging of sidewalks, and other improvements, must be apportioned between the tenant for life, and the remainderman.

In *Stillwell* v. *Doughty* (2 *Bradf.*, 311), it was held that the tenant for life must pay the annual interest upon the assessment, but that the principal is chargeable to the remainderman, and this division of the burden, is put upon the ground, by Surrogate BRADFORD, that a life tenant has the benefit, and the use of the permanent improvement, while the improvement itself enures to the benefit of the remainderman.

In *Peck* v. *Sherwood* (56 *N. Y.*, 615), the same principle is declared. It is also held in that case that the expenses for insurance, and placing lightning rods on the building, should be apportioned, although the case does not disclose the proportion which the court deemed proper to charge upon the respective estates, but the decision of the case of *Stillwell* v. *Doughty* (*supra*) seems to be reasonable and just. I am not able to discover any evidence in the will in question indicative of an intent on the part of the testator to charge his estate with the payment of taxes and assessments, the making of the necessary repairs on the Elizabeth property. Under these authorities, it seems to me that any repairs which do not come under the head of ordinary repairs, but are necessary and permanent improvements to the estate, should be chargeable to the tenants for life, and to the remainderman, or the residuary estate, in the proportion suggested by the above authorities; in other words, that a life tenant must be held liable for the interest upon the permanent improvements, and the estate held liable for the improvements themselves, but that temporary, or ordinary repairs are chargeable against the life tenant, and that in this case they are so chargeable, except so far as they appear to have been

made on the credit and responsibility of the widow, to whose estate the trustees must look for their reimbursement, unless they shall appear to have assets in their hands belonging to her, but the testimony upon the subject of such taxes, improvements, insurance, &c., is not sufficiently specific to enable me to determine the appropriate charges to the respective interests, and the matter will have to go to a reference for further proof upon that subject, so that the separate expenditures whether for permanent or temporary repairs may be clearly stated.

As to the question of the validity of the note for $4,982.57 executed by the testator under seal, dated December 29th, 1862, I entertain no doubt upon the testimony as to the execution of the note, nor do I think that the failure on the part of the claimant to enforce payment of the note, or the lapse of time, in any way militate against the validity of the note. Such delay may be entirely consistent with the liability of the estate to pay, and the right of the owner to enforce payment; nor does the fact that the widow persuaded the owner to delay the enforcement either of interest or principal, impair its validity. While those circumstances were competent as evidence upon the subject of its validity, yet in the absence of any proof of payment, or release of the liability, or any other circumstance affecting its validity, the note must be held valid, unless it be barred by the statute of limitations.

As the note purports on its face, and by the terms of the instrument to be under seal, there seems to be no doubt of the seal, such as it is, having been attached at the time when it was signed. It is objected by the counsel for the legatees that the instrument is not under seal, as the so-called seal is not made of wax, or wafer, or any other substance capable of being impress-

ed, but is simply a paper seal, without the accustomed wafer, or wax beneath it.   *Webster* defines a seal to be wax affixed to a letter, or instrument, and impressed with a seal, also wax, wafer, or other adhesive substance which closes a letter, or other paper, that which confirms, or secures—confirmation—authentication—attestation.   Bouvier, in his dictionary, defines a seal to be an impression upon wax or wafer, or some other tenacious substance capable of being impressed; and this is the common law definition.   By section 61 (2 *Statutes at Large*, 420,) it is provided that the seal of any court, or public officer may be affixed by an impression directly on the paper, and shall be so valid as if made by a wafer, or wax; but the 62d section provides that this latter section shall not extend to private seals, which shall be made as heretofore, on wafer, wax, or some similar substance.

In *Coit* v. *Millikin* (1 *Denio*, 376), Chief Justice BRONSON, in discussing the sufficiency of a seal of the State of Michigan, which was impressed upon paper, not upon wax, of other adhesive substance, says, "at common law a seal is an impression upon wax, wafer, or some other tenacious substance; the impression upon paper alone is not a seal except where it has been made so by statute."   To the same effect is *Warren* v. *Lynch* (5 *Johns.*, 238).

In *Ross* v. *Bedell* (5 *Duer*, 462), Judge DUER, in discussing the question whether a notarial certificate was sufficient with the seal stamped upon the paper says: " we are clearly of opinion than an actual seal stamped upon paper of sufficient tenacity to receive and retain the impression, must be deemed *a* seal in the technical sense, and within the strict definition of the common law,"—citing also the case of *Curtis* v. *Leavitt* (17 *Barb.*, 318), as authority for that principle; but though this

decision by Judge DUER, was in March, 1856, he makes no reference to the statute above referred to, passed in 1848, authorizing such an impression as a seal. In the case of *Curtis* v. *Leavitt*, (*supra*) Mr. Justice ROOSEVELT, held that bonds issued by a Trust and Banking Company were sufficiently sealed by the impression of a seal upon paper not impressed upon wax, or wafer, but stamped into the paper. He says, "the whole discussion on this point every sensible man must admit, were it not for some unfortunate *dicta* in the books, would look very much like childish trifling ;" yet that judge fails to consider the force of the *Revised Statutes* above cited.

It is in evidence in this case that the testator intended to seal the instrument in question, and that what purported to be such, was so recognized by the parties, when he executed the note in question, and I am of the opinion under the authorities, that the paper called the seal, which was affixed by moistening the mucilage upon it, in order to make it adhere and the stamping of it for that purpose, constituted to all intents and purposes, a seal according to common law, for the mucilage was a substance sufficiently tenacious to adhere, and receive an impression, and it appears to have had that impression.

The object of a seal is doubtless to receive a permanent impression, and that at the time of the early authorities defining a common law seal, the subsistence of mucilage was unknown, but it seems to me that that substance answers the purpose of a permanent impression, much more than does an impression upon wax ; the one adheres by means of moisture, the other of heating, but the wafer adheres by moisture also ; besides, it seems to me that it would be an extraordinary principle to hold as between individuals making and enforcing

contracts, recognized and understood by both parties to be under seal affixed for the purpose of affecting the result, that the seal should be denied that effect; certainly, no question of public policy would forbid, and I have no hesitation in holding that the note in question is a sealed note for all practical purposes, and therefore not barred by the statute of limitations, and must be allowed to the executor holding the same.

The evidence that the owner of this note never intended to enforce it, and was induced to present it, because of what he supposed to be an improper, and unjust litigation of the claims of the trustees, constitutes no legal objection to its enforcement, and in no way militates against the validity of the claim, and even a verbal agreement not to enforce it, without consideration, would be void. I think the claimant entitled under all the facts disclosed to the amount of the note according to its terms.

As to the claim of the counsel for the legatees that no commissions should be allowed the executors in this matter, an examination of the testimony has satisfied me that the executors have not wilfully committed any breach of trust, nor have they been guilty of any vexatious conduct in their treatment of the estate. It is true that they have retained irregular securities contrary to the requirements of the law, yet they were securities paying a large income, until the entirely unforeseen and most extraordinary disaster, to wit: the Chicago fire, occurred, which swept away much of the capital of those insurance companies, and nevertheless they continued to pay the legatees as though the income had continued. I am not able to find any evidence of such dereliction of duty as would justify a refusal of commissions.

As to the question of the costs of this proceeding,

though some irregularities have been shown in respect to the trustees' account, rendering this investigation more difficult and embarrassing and expensive, yet according to my views herein expressed, several matters of considerable moment have been objected to and litigated, which have resulted adverse to the objectors. I am not prepared to say that an undue proportion of the litigation has resulted from the neglect or misconduct of the executors, and I see no good reason why the estate should not pay the expenses of the same. As to the amount to be allowed the respective counsel, let that question be reserved until the final decree.

Decree accordingly.